J-S32027-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.N.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.S.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1692 EDA 2024 |

Appeal from the Decree Entered June 14, 2024
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000186-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: J.N.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.S.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1693 EDA 2024 |

Appeal from the Decree Entered June 14, 2024
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000187-2024

BEFORE: LAZARUS, P.J., STABILE, J., and KING, J.

MEMORANDUM BY STABILE, J. **FILED OCTOBER 28, 2024**

W.S.B. ("Mother") appeals from the June 14, 2024 decrees entered in

the Court of Common Pleas of Philadelphia County involuntarily terminating

her parental rights to her biological daughters, H.N.B., born July of 2021, and J.N.B., born December of 2022 (collectively, "the Children").[1,2] We affirm.

The certified record reveals the following relevant facts and procedural history. The Philadelphia Department of Human Services ("DHS" or "the Agency") became involved with this family in February of 2023, when J.N.B. was approximately two months old, after she was diagnosed with failure to thrive. *See* N.T., 6/14/2024, at 7-8. The Agency also had concerns regarding Mother's unstable housing. *Id.* Consequently, J.N.B. was temporarily committed to the custody of DHS and placed in a pre-adoptive foster care home following a shelter care hearing on February 10, 2023, where she remained at the time of the termination proceeding. *See* DHS Exhibit 4, at 25-26; *see also* N.T., 6/14/2024, at 8-9, 18.

We note that H.N.B.'s status during these events is not entirely clear from the certified record. As best we can discern, she was residing with a member of her extended family at this point in time. *See* N.T., 6/14/2024, at 8. However, DHS subsequently obtained emergency custody of H.N.B. in

---

[1] There was no identified father for H.N.B. at the time of the termination proceeding. *See* N.T., 6/14/2024, at 23. The trial court terminated any unknown putative fathers' parental rights to H.N.B. by separate decree on June 14, 2024. No notices of appeal have been filed in relation to the unknown putative fathers' termination decree.

[2] The trial court involuntarily terminated the parental rights of J.N.B.'s father B.W. ("Father"), as well as any unknown putative fathers, by separate decrees on June 14, 2024. No notices of appeal have been filed by Father or in relation to the unknown putative fathers' termination decree.

July of 2023, when she was approximately one year old, after her original kinship caretaker could no longer care for her. *Id.* Ultimately, DHS placed H.N.B. with her maternal grandmother, a pre-adoptive placement, where she remained at the time of the termination proceeding. *Id.* at 8, 23-24.

The trial court adjudicated the Children dependent on July 17, 2023, and established their respective permanency goals as reunification.[3] *See* DHS Exhibit 4 at 28. In furtherance of that goal, Mother was ordered to: complete a dual diagnosis assessment for mental health and substance abuse with the Clinical Evaluation Unit ("CEU"); complete random drug screens at the CEU; attend the Achieving Reunification Center ("ARC") for employment; provide proof of housing; and sign releases. *Id.* at 28-31. In addition, Mother was required to participate in supervised visitation with the Children. *Id.* Mother's various services were administered by the Community Umbrella Agency ("CUA").

Permanency review hearings were held at regular intervals throughout the Children's dependency proceedings. The trial court found Mother non-complaint with her permanency plan and that she made no progress towards reunification at permanency review hearings on September 18, 2023 and March 5, 2024. *See* DHS Exhibit 4, at 29-30, 32-33. The certified record also

_____

[3] The Honorable Wendi D. Barish presided over the Children's dependency proceedings as well as the subject termination proceeding.

indicates that Mother failed to maintain sufficient communications with the Agency's service providers. *See* N.T., 6/14/2024, at 9-10, 33. Specifically, CUA case manager, Shonse Hawkins, testified that the last time she had successful contact with Mother was in November of 2023. *Id.* at 9-10. Further, Mother never participated in the court-ordered supervised visitation with the Children, despite connecting with the Agency to coordinate visitation, but only with respect to J.N.B., the younger child. *Id.* at 13, 21-22.

Of additional note, in February of 2024, Mother was incarcerated for a probation violation due to her arrest for retail theft. *Id.* at 27-28, 31-32; *see also* DHS Exhibit 5. Mother remained incarcerated in connection with these charges at the time of the subject termination hearing. Her ultimate release date was disputed.[4]

On May 6, 2024, DHS filed petitions for the involuntary termination of Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). The court held an evidentiary hearing on the petitions on June 14, 2024, at which time the Children had been in care for over twelve months. The Children, then ages two years, ten months old and eighteen months old, respectively, were represented by their guardian *ad*

_____

[4] There is discrepancy in the testimony regarding Mother's release date. Mother speculated her release date was August 27, 2024, but Ms. Hawkins stated was that Mother reported she would remain incarcerated until February of 2025. *See* N.T., 6/14/2024, at 10-11, 27. At the time of the termination proceeding, Mother was awaiting a waiver trial that was scheduled for June 28, 2024. *Id.* at 32; *see also* DHS Exhibit 5.

*litem* ("GAL"), Angelina Dagher, Esquire, who had been appointed for them in the underlying dependency proceedings.[5] The Agency presented the

_____

[5] Our Supreme Court has held that "appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in conformity with" 23 Pa.C.S.A. § 2313(a). ***In re Adoption of K.M.G.***, 240 A.3d 1218, 1235 (Pa. 2020). Further, if the appointed counsel also serves as GAL, "appellate courts should review *sua sponte* whether the orphans' court made a determination" that the child's legal interests and best interests "did not conflict." ***Id.*** These findings by the orphans' court must typically be conducted **before** counsel's appointment and should appear within the orders appointing counsel. ***See id.*** at 1236 ("Both inquiries involve a yes or no answer that can be addressed by a review of the orphans' court order (or lack thereof) appointing counsel to represent a child under Section 2313(a).").

Our review of the certified record in this case reveals that the trial court did not issue orders appointing counsel to represent the Children's legal interests in the involuntary termination matter. However, the GAL appeared at the relevant proceeding to represent the Children. The court determined on the record, after DHS rested its case, that the GAL was able to represent the Children's dual interests without conflict due to their ages. ***See*** N.T., 6/14/2024, at 26-27. Our Supreme Court has held that where an attorney-GAL is present in termination of parental rights proceedings undertaking the task of advocating for the child's best interests, Section 2313(a) does not require the appointment of another lawyer to fulfill the role of advancing the child's unknowable preference. ***In re T.S.,*** 192 A.3d 1080, 1090 (Pa. 2018).

Under these circumstances, we need not vacate the decrees. Nevertheless, we caution the court against failing to comply with the Supreme Court's mandate to issue a separate order appointing counsel to represent the legal interests of a child involved in an involuntary termination matter and, if the appointed counsel also serves as GAL, to determine "**prior to appointment**" whether the child's dual interests did not conflict. ***K.M.G.,*** 240 A.3d at 1236 (emphasis added); ***see***, ***e.g.***, ***Interest of A.J.R.O.***, 270 A.3d 563 (Pa. Super. 2022) (vacating involuntary termination decree because the orphans' court failed to determine whether the child's legal interests and best interests conflicted prior to appointing a single attorney to represent both; and remanding to allow the common pleas court to make the required determination).

testimony of Ms. Hawkins in support of its petition to involuntarily terminate Mother's parental rights. Mother testified on her own behalf *via* telephone from prison.

By decrees dated and entered on June 14, 2024, the trial court terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed its Rule 1925(a) opinion on July 12, 2024.

On appeal, Mother presents the following issues for our review:

I.    Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother pursuant to [S]ection 2511(a)(1) where Mother presented evidence that she tried to perform her parental duties and will be released from prison to continue her parental duties.

II.    Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother pursuant to [S]ection 2511(a)(2) where Mother presented evidence that she has worked to remedy her situation and will have the present capacity to care for her children once released from prison.

III.    Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother pursuant to [S]ection 2511(a)(5) where evidence was provided to establish that the [C]hildren [were] removed from the care of Mother and Mother will be capable of caring for her children upon release from prison.

IV.    Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother pursuant to [S]ection 2511(a)(8) where evidence was presented to

show that Mother will be capable of caring for her children once she is released from prison.

V.      Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother pursuant to [S]ection 2511(b) where evidence was presented that the [C]hildren initially lived with her and she attended visits when she was able to visit with [the] [C]hildren.

Mother's Brief at 7 (cleaned up).[6]

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such,

_____

[6] While the GAL did not participate in the present appeals, the GAL stated on the record in open court at the termination proceeding that she was "in total agreement" with DHS and it is in the Children's "best interests to be freed up for adoption." *See* N.T., 6/14/2024, at 40.

the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the trial court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b).

Our analysis in this case will focus upon Section 2511(a)(1) and (b),[7] which provides as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

_____

[7] This Court need only agree with the trial court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See M.E.*, 283 A.3d at 830 (citing *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)). Based on this disposition, we need not consider Mother's arguments with respect to Section 2511(a)(2), (5), and (8).

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

In order to establish grounds for termination pursuant to Section 2511(a)(1), "[a] petitioner. . . must demonstrate by competent, clear and convincing evidence, '[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.'" *In re Adoption of C.M.*, 255 A.3d 343, 363-64 (Pa. 2021); *see also* 23 Pa.C.S.A. § 2511(a)(1).

In assessing Section 2511(a)(1), trial courts should consider the entire history of the case and avoid applying the statutory six-month requirement mechanically. *C.M.*, 255 A.3d at 364. However, the General Assembly's emphasis on the six months immediately preceding the filing of the

termination petition indicates this timeframe is the "most critical period for evaluation" of a parent's conduct.  *In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021).

"When considering a request to terminate parental rights under Section 2511(a)(1), a parent's failure or refusal to perform parental duties 'must be analyzed in relation to the particular circumstances of the case.'"  *Id.*  (citing *In re Burns*, 379 A.2d 535, 540 (Pa. 1977)).  Thus, "even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months. . ., the court 'must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights].'"  *Id.* at 593.  The totality of the circumstances includes consideration of the following: "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b)."  *Id.*  A finding that a parent has refused or failed to perform parental duties "will not be predicated upon parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control," but may "only result when a parent has failed to utilize all available resources to preserve the parental relationship."  *Id.* at 592.  (citing *Burns*, 379 A.2d at 540).

In ***In re Adoption of S.P.***, 47 A.3d 817, 826-827 (Pa. 2012), our Supreme Court discussed ***In re Adoption of McCray***, 331 A.2d 652 (Pa. 1975), a case wherein the Court considered the issue of the termination of parental rights of incarcerated persons involving abandonment, which is currently codified at Section 2511(a)(1). The ***S.P.*** Court stated:

> Applying in ***McCray*** the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty of love, protect and support his child and to make an effort to maintain communication and association with that child." ***Id.*** at 655. We observed that the father's incarceration made his performance of this duty "more difficult." ***Id.***

***In re Adoption of S.P.***, 47 A.3d at 828. The ***S.P.*** Court continued:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. *Rather, we must inquire whether the parent has utilized those resources at his or her command while in person in continuing a close relationship with the child.* Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.
>
> [***McCray***] at 655 (footnotes and internal quotation marks omitted).

***In re Adoption of S.P., supra*** (emphasis added); ***see also In re B.,N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004) (internal citations omitted) (stating that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child").

If the trial court concludes that adequate grounds for termination exist pursuant to Section 2511(a), the court then turns to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has directed that a Section 2511(b) inquiry must include consideration for the bond between the parent and the child. *In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has further explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." *Interest of K.T.*, 296 A.3d 1085, 1109 (Pa. 2023). "However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citing *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008)).

Our Supreme Court has recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109. Further, trial courts "must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 1106. We will not disturb a trial court's Section 2511(b) assessment if the factual findings are supported by the record. *M.E.*, 283 A.3d at 839.

With respect to Section 2511(a)(1), Mother asserts that she has "never evidenced a settled purpose of relinquishing her parental rights, nor has she refused to perform her parental duties." *See* Mother's Brief at 15. We disagree.

The trial court summarized its relevant findings as follows:

> In the six months leading up to the filing of the petitions of this case in May 2024, Mother . . . [has] not availed [herself] to be a part of [the] [C]hildren's lives and, in essence, [has] abandoned the [C]hildren during that time period, and [has] not done anything to establish any parental claim, and [she] certainly did not perform any parental duties in the six months leading up to the filing of the petition.
>
> . . .
>
> Prior to Mother becoming incarcerated, her compliance and progress were none . . . there was no attempt by Mother to remedy the situation prior to her incarceration, and she has not even made an attempt to see the [C]hildren.

N.T., 6/14/2024, at 43, 45.

The trial court findings are fully supported by the record evidence. Mother's bald claims that she has worked to meet her permanency goals are belied by her own testimony at the termination proceeding. *Id.* at 34-35. On cross examination, Mother testified as follows:

> Q. Ma'am, do you recall at any point in time what your Single Case Plan objectives are in this case?
>
> A. I do.
>
> Q. So you –
>
> A. Because I believe I – I got – I received a copy of the court order.

- 13 -

Q. Okay. So you have the court order that lists exactly what's required of you in order to be reunified with your children?

A. Yes.

. . .

Q. And you're aware that this case has been open for over [twelve] months, right?

A. Yes.

Q. Now, I understand that you're incarcerated now, but you have not been for the entirety of that [twelve] months, right?

A. Correct.

Q. And you would agree, though, that you have not completed any of the objectives that this [c]ourt has ordered you to complete, correct?

A. Correct.

*Id.* Ms. Hawkins' testimony confirmed that Mother had not completed any of her permanency plan goals. *Id.* at 10-14. Both Mother and Ms. Hawkins testified that the last time Mother had contact with the Agency was in November of 2023, which was seven months before the termination hearing. *Id.* at 9-10, 33. Mother offered no explanation for her lack of action or communication with the Agency. Ms. Hawkins characterized Mother's compliance with her goals and progress towards reunification as none. *Id.* at 13-14.

Ms. Hawkins testified that the Agency never received any documentation attesting that Mother was in any type of treatment outside of the court-ordered CEU, which she also did not complete. *Id.* at 12-13. Mother testified

that she had completed a drug and alcohol program before she was incarcerated in February of 2024, but admitted she did not have any evidence to provide to the trial court in relation to this assertion. *Id.* at 28, 34-35.

Importantly, Ms. Hawkins' testimony was that Mother initiated contact with the Agency's visitation team three or four times, but only with respect to visitation with J.N.B. *Id.* at 13, 21-22. The Agency set up the requested visitation solely with J.N.B., but Mother never followed through with any visit. *Id.* Ms. Hawkins stated that Mother never had any physical contact with J.N.B. since she was removed from Mother's care, which Mother confirmed in her own testimony. *Id.* at 13, 29. Ms. Hawkins further testified that the Agency was not aware of any contact between Mother and H.N.B. *Id.* at 21-22. The trial court consequently found that "Mother did not avail herself to any of the visitation afforded to her under this [c]ourt's order to have supervised visits at the [A]gency for the life of this case." *Id.* at 46.

As such, the record supports the court's determination that Mother had failed to perform her parental duties for a period in excess of six months prior to the filing of the termination petitions as required by Section 2511(a)(1). We reiterate that a finding that a parent has refused or failed to perform parental duties may "only result when a parent has failed to utilize all available resources to preserve the parental relationship." *L.A.K.*, 265 A.3d at 592. The testimonial evidence demonstrates that Mother had failed to utilize all available resources to preserve her parental relationship with the Children

both prior to and during her incarceration. Indeed, the younger child, J.N.B., had been in placement for twelve months, and H.N.B. for seven months, prior to Mother's incarceration in February of 2024, and during that time Mother did not participate in any of her permanency objectives. Further, Mother was incarcerated for approximately three months at the time the Agency filed the involuntary termination petitions, but there is no evidence that Mother attempted to maintain a relationship with the Children during that time. **See** **S.P.**, 47 A.3d at 826-828; **see also** 23 Pa.C.S.A. § 2511(a)(1). Upon consideration of the totality of the circumstances, we discern no error of law or abuse of discretion. Therefore, Mother's issue fails with respect to Section 2511(a)(1).

We now turn to Mother's challenge to the trial court's findings pursuant to Section 2511(b), which affords primary consideration of the developmental, physical, and emotional needs and welfare of the Children. **See** 23 Pa.C.S.A. § 2511(b). Mother argues that J.N.B. lived with her when the case was initiated, and that she consistently visited H.N.B. **See** Mother's Brief at 12. Specifically, Mother argues that the Children were not brought to the prison once she was incarcerated, and she should have been provided with "ongoing" visits so that she could continue to bond with the Children. **Id.** at 19.

Considering the parent-child bond under the required Section 2511(b) analysis, the trial court found "there was no evidence to support a parent-

child bond existed between Mother and each [c]hild." **See** Trial Court Opinion, 7/12/2024, at 2. Indeed, the trial court explained on the record in open court:

> They don't have any parent-child bond. They have not spent any substantial time for more than a year now with . . . either biological parent . . . and all of their parental needs are met by their caregivers, so they certainly don't look to any of the named parents to meet any of their needs or look to them as a child looks to a parent.

N.T., 6/14/2024, at 47. We discern no error of law or abuse of discretion as this holding is supported by the record evidence.

All of Mother's arguments as to Section 2511(b) fail because, as detailed above, she had not participated in the court-ordered supervised visitation with the Children for the life of their dependency matters, even prior to her incarceration. **See** N.T., 6/14/2024, at 13, 21-22, 25, 29, 46. Thus, it was reasonable for the trial court to infer no bond existed between Mother and the Children as there was no evidence presented as to a bond at the termination hearing. **See J.M.**, 991 A.2d at 324.

The trial court also considered the Children's need for permanency. **See** N.T., 6/14/2024 at 46. As the Children had been in care for over twelve months, and "they are one and two years, . . . what's most important is for them to have permanency in their life." **Id.** The Children have resided in separate pre-adoptive homes throughout their dependency matters. **Id.** at 18, 24. The trial court found that "[the Children have] been in loving homes with people who are meeting all of their parental needs for the life of this case." **Id.** at 46. Specifically, with respect to J.N.B., Ms. Hawkins testified

that her caregiver manages her specials needs because of her failure to thrive diagnosis and acknowledged that the child has gained weight since being placed with her caregiver. *Id.* at 17, 19. Ms. Hawkins testified that the Children have mother-daughter bonds with their respective caregivers, which she had personally observed many times. *Id.* at 17, 23. Ms. Hawkins emphasized that it would be "very detrimental" to the Children to be removed from their current pre-adoptive placements. *Id.* at 18, 24.

Based upon the testimonial evidence set forth above, we discern no abuse of discretion or error of law in the trial court's conclusion that DHS met its evidentiary burden pursuant to Section 2511(b). Thus, we affirm the decrees pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/28/2024